# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

              Plaintiff,

    vs.                        **Case No. 10-40055-01/02-RDR**

JUSTINO CRUZ-CHAVEZ and
MARCELLINO TOSCANO-BURGUENO,

              Defendant.

_____

## <u>MEMORANDUM AND ORDER</u>

This matter is presently before the court upon a variety of motions filed by the defendants, Justino Cruz-Chavez and Marcellino Toscano-Burgueno. The court has conducted a hearing on these motions and is now prepared to rule.

The defendants are charged in a one-count indictment with possession with intent to distribute methamphetamine and cocaine in violation of 21 U.S.C. § 841(a)(1). The charge arises out of a traffic stop on April 6, 2010 in Wabaunsee County, Kansas.

Cruz-Chavez has filed the following motions: (1) motion to sever; (2) motion to dismiss based on racial profiling; and (3) motion to suppress. Toscano-Burgueno has filed the following motions: (1) motion to join in co-defendant's motion to dismiss based on racial profiling; (2) motion to sever parties; (3) motion for discovery; (4) motion to suppress evidence seized following illegal stop; and (5) motion to suppress statement.

**MOTIONS TO SUPPRESS**

Based upon the evidence presented at the hearing, the court makes the following findings of fact and conclusions of law.

*Findings of Fact*

1.    On April 6, 2010, Kansas Highway Patrol (KHP) Trooper Christopher Nicholas was patrolling Interstate 70 in Waubaunsee County, Kansas.  Trooper Nicholas has been employed by the KHP for 9 ½ years.  He has received training on several occasions on drug interdiction.

2.    While parked in the median, Trooper Nicholas observed a 1998 Dodge pickup traveling east on I-70 at approximately 7:00 a.m. He noticed that the truck had an unusual grill guard on it.  He had observed such a grill guard on a truck two days earlier.  That truck, which was bound for Kansas City, was determined to have a hidden compartment that contained illegal drugs.  Trooper Nicholas had previously seen the Dodge pickup earlier in the day at a rest area a few miles west of where he now encountered it.  He followed the truck for a short period and saw that it crossed the fog line on the right side of the road on two occasions within a quarter of a mile. The truck crossed the fog line by approximately the width of a tire.  It was a very windy day.  The National Weather Service clocked the wind speed at approximately 7:00 a.m. on that day in nearby Topeka, Kansas at 27.6 miles per hour with gusts to 34.5 miles per hour.  The truck was drifting to the south even though

the wind was from the south.  Trooper Nicholas observed no reason
for the truck to be drifting that far off the road in such a short
stretch of highway.  The road in that area is straight, flat and
smooth.

3.  Trooper Nicholas pulled up to the truck and looked through
the side window of the truck.  He did so for safety reasons. He
indicated that he likes to know how many people are in a vehicle
that he is considering pulling over for a traffic violation.  He
thought there were two individuals in the truck, but he was unable
to determine their race or ethnicity.  He then activated his
emergency lights and pulled the truck over.  The truck stopped
quickly and moved to the side of the road.  Trooper Nicholas'
patrol car had a video camera that recorded the traffic stop.  The
camera recorded the conversation that occurred following the stop,
but much of the audible audio comes from Trooper Nicholas.

4.  Trooper Nicholas approached the car and acknowledged that
it was windy but that he wanted to see if the occupants were
alright.  He explained that he had observed the truck move off the
road on two occasions.  The driver, who was later identified as
Justino Cruz-Chavez, indicated that the truck had suspension
problems.  The truck contained one other individual who was later
identified as Marcellino Toscano-Burgueno.

5.  During the encounter, Trooper Nicholas and Cruz-Chavez
were able to readily communicate.  Cruz-Chavez appeared to

understand English, even though there was some difficulty on some of the questions. Trooper Nicholas was relaxed, polite and respectful during the stop.

6. Trooper Nicholas told Cruz-Chavez that he was not going to issue him a ticket but that he needed to see his driver's license, registration, insurance documentation and the passenger's identification. Trooper Nicholas then asked certain questions about the nature of the trip. Cruz-Chavez told Trooper Nicholas that they were returning to Kansas City from a vacation in Denver. He indicated that the vacation had lasted four days. Both occupants of the truck lived in Kansas City. Cruz-Chavez indicated that the truck belonged to a friend who had loaned it to him. The registration showed that it was owned by Javier Naris. Trooper Nicholas thought Cruz-Chavez appeared unusually nervous even after he told him that he was not going to issue him a ticket. Trooper Nicholas also thought the presence of a gas can in the bed of the pickup truck was unusual. Trooper Nicholas returned to his patrol car and ran a check on the information provided by the occupants. He found nothing unusual. He then returned the documents and told the occupants that they perhaps needed to stop and take a break. He concluded the stop by saying, "Have a safe trip. Thank you." Trooper Nicholas then stepped away from the truck and turned toward his patrol vehicle. He then turned back and asked Cruz-Chavez if he could ask some more questions. Cruz-

Chavez agreed to answer some additional questions. Trooper Nicholas asked again how long they had stayed in Denver. This time Cruz-Chavez answered three days. Trooper Nicholas asked him if they had any illegal drugs or weapons in the truck. Cruz-Chavez responded no. Trooper Nicholas then asked if he could search the truck. Trooper Nicholas asked for permission to search in a conversational tone. He did not touch his weapon or act in an aggressive manner. Cruz-Chavez indicated that he could.

7. Prior to requesting consent to search, Trooper Nicholas had determined that he wanted to search the truck. The information he had learned during the stop had provided what he believed was suspicious activity. He focused upon the following information: (1) the occupants were traveling from Denver, a known "hub city" for the distribution of illegal drugs; (2) the conflicting answers of the driver concerning the length of the stay in Denver; (3) the absence of the owner of the truck; (4) the presence of a gas can in the bed of the truck; (5) Dodge trucks are known to carry illegal drugs in areas that have been modified to form hidden compartments; (6) the new grill guard on the truck was similar to one he had seen two days earlier on a truck that was carrying illegal drugs; and (7) the nervousness of the driver even after he told him that he was only going to issue him a warning.

8. Trooper Nicholas began looking under and around the truck. He determined that the gas tank had not been modified. He asked

Cruz-Chavez to open the hood of the truck.  Trooper Nicholas then begin examining the engine area of the truck.  He thought the bolts on the intake manifold looked unusually "tooled."  He retrieved an antenna from his vehicle and put it into a vacuum hose.  The antenna could only be inserted about an inch.  He also saw a shiny plate under the throttle.  These were clear indications to Trooper Nicholas that the engine area had a modified, hidden compartment. He directed the occupants to step out of the vehicle as he returned to his patrol car.  He then radioed for additional assistance.  The occupants were placed under arrest.  He told the occupants after they had been arrested that there was a "compartment in the manifold."

9.  Another trooper, who had arrived on the scene, started the truck and began to drive it to headquarters in Topeka.  During the trip, the truck broke down.   The manifold was removed and a post-manufacture compartment was found that contained methamphetamine and cocaine.

10.  The defendants were taken to Topeka.  Their cell phones were seized and the contents were downloaded.  Two officers attempted to interview Cruz-Chavez and Toscano-Burgueno.  Paul Tavares, a process server with the Shawnee County Sheriff's Department (SCSD), served as an interpreter.  Tavares has worked for the SCSD since 1998.  He has translated for 14 years in various settings.  He spoke both English and Spanish as a youth. He took

Spanish classes in high school. He has traveled to Mexico on a number of occasions. While there, he spoke Spanish. Before he began translating for Shawnee County, he took a test and was found to be "proficient" in the Spanish language. He has served as an interpreter in at least two criminal trials. He has also served as interpreter for at least a dozen hearings. However, most of his activity as an interpreter has not occurred in a legal setting.

11.    Tavares had no trouble understanding and communicating with either Cruz-Chavez or Toscano-Burgueno. Both spoke only Spanish during the interview process. He indicated that each spoke "standard Spanish." He read the <u>Miranda</u> warning to Cruz-Chavez as it was written on a Drug Enforcement Administration (DEA) form. Cruz-Chavez stated that he understood his rights but refused to initial the form indicating that he understood his rights. He asked to speak to an attorney and his interview ended.

12.    Tavares then read the <u>Miranda</u> warning to Toscano-Burgueno, again from the DEA form. Toscano-Burgueno read along as he held a card that contained the <u>Miranda</u> warning in Spanish. He stated he understood his rights and he initialed the form indicating that the warning had been read to him and that he understood his rights. He then signed the form indicating that he wanted to answer questions without the presence of an attorney. Toscano-Burgueno then began providing certain information with Tavares acting as the interpreter.

7

*Conclusions of Law*

1.  Cruz-Chavez contends that Trooper Nicholas did not have an objectively reasonable belief to stop the truck.  He suggests that the following factors preclude a finding of reasonable suspicion: (1) the wind was blowing hard; (2) the truck had a faulty suspension; (3) the deviation from the lane was minor; and (4) the truck crossed the fog line, not the center line.  Cruz-Chavez also suggests that Trooper Nicholas was "known to stop people of color on a pretext."  Cruz-Chavez next contends that he did not consent to a search of the truck because he did not understand the question that Trooper Nicholas asked.  He points out that he speaks only Spanish and only understands enough rudimentary English to know he needed to provide his driver's license and registration when stopped for a traffic infraction.  Finally, he argues that he was arrested illegally because he was handcuffed and placed in the patrol car before any contraband was found.

2.  Toscano-Burgueno contends that the initial stop was illegal because Trooper Nicholas did not observe a violation of the failure to maintain a single lane of traffic statute, K.S.A. 8-1522(a).  He further argues that his continued detention was unreasonable.  He suggests that the purpose of the stop was completed once Trooper Nicholas determined that he would not issue a ticket to the driver.  He contends that the continued detention

was a Fourth Amendment violation. He further asserts that neither he nor Cruz-Chavez consented to further questioning. He also argues that Cruz-Chavez did not consent to a search of the truck. He also contends that there was insufficient probable cause for his arrest. Finally, he contends that the statements he made following his arrest should be suppressed because his waiver of his Fifth Amendment right against self-incrimination was not knowing, intelligent and voluntary. He suggests that he lacked an understanding of his rights due to the inadequacy of the language translation.

3. The government argues in response to Cruz-Chavez' arguments on the initial stop that (1) the stop of the truck was reasonable because Trooper Nicholas had a reasonable belief that a traffic infraction had occurred; and (2) Trooper Nicholas could briefly detain the driver to determine why he was driving outside the lane of traffic. The government further argues that the actions of Trooper Nicholas prior to gaining consent to search were reasonable and appropriate. Finally, the government contends that Cruz-Chavez consented to a search of the truck because, although English is not his native language, there is nothing to indicate that he did not understand the request. With regard to Toscano-Burgueno, the government makes the same arguments concerning the stop that it raised concerning the motion to suppress of Cruz-Chavez. The government further suggests that Toscano-Burgueno

lacks standing to challenge the car stop. Finally, the government argues that Toscano-Burgueno's contention that his statement should be suppressed because he did not understand the interpreter is without merit. The government points out that the interpreter was experienced and fluent in Spanish.

4. The court shall begin with the issue of standing. The government has only challenged the standing of the passenger, Toscano-Burgueno, to object to the car stop. During a traffic stop, a passenger is "seized" for Fourth Amendment purposes and thus has standing to challenge the validity of the stop at issue. <u>Brendlin v. California</u>, 551 U.S. 249, 251 (2007). However, the passenger's right to contest a subsequent search not of his or her person but the vehicle remains subject to analysis under <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978). <u>United States v. Cortez-Galaviz</u>, 495 F.3d 1203, 1206 (10th Cir. 2007). In <u>Rakas</u>, the Supreme Court held that a passenger who asserts neither a possessory nor a property interest in a vehicle "would not normally have legitimate expectation of privacy" in the vehicle protected by the Fourth Amendment. <u>Rakas</u>, 439 U.S. at 148-49.

5. Toscano-Burgueno was a passenger in the truck and does not assert any possessory or property interest in it. Thus, he lacks standing to challenge the vehicle search. He does, however, have standing to challenge the stop as well as his own detention.

6. The court turns next to the traffic stop. A traffic stop

is a seizure under the Fourth Amendment. <u>United States v. Taverna</u>, 348 F.3d 873, 877 (10th Cir. 2003). To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." <u>United States v. Soto</u>, 988 F.2d 1548, 1554 (10th Cir. 1993). Thus, the constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

7. Trooper Nicholas stopped the defendants' vehicle based upon an alleged violation of K.S.A. 8-1522(a), which provides that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . .[a] vehicle shall be driven as nearly as practicable entirely within a single lane." This court has had ample opportunities to consider this statute. <u>See</u> <u>United States v. Rocha</u>, 2008 WL 4498950 (D.Kan. 2008); <u>United States v. Nunez-Bustillos</u>, 2005 WL 2704958 (D.Kan. 2005); <u>United States v. Stokes</u>, 2003 WL 23145909 (D.Kan. 2003); <u>United States v. Hernandez-Mercado</u>, 1999 WL 359907 (D.Kan. 1999), <u>aff'd</u>, 1 Fed.Appx. 827 (10th Cir. 2001), <u>cert. denied</u>, 532 U.S. 950 (2001); <u>United States v. Ozbirn</u>, 1997 WL 457518 (D.Kan. 1997), <u>aff'd</u>, 189 F.3d 1194 (10th Cir. 1999); <u>United States v. Simons</u>, 1997 WL 309134

(D.Kan. 1997); <u>United States v. Hernandez</u>, 944 F.Supp. 847 (D.Kan. 1996).  In general, an officer's observation of a vehicle straying out of its lane multiple times over a short distance creates reasonable suspicion that the driver violated K.S.A. 8-1522(a) so long as the strays could not be explained by "adverse physical conditions" such as the state of the road, the weather, or the conduct of law enforcement.  <u>United States v. Cline</u>, 349 F.3d 1276, 1287 (10th Cir. 2003); <u>United States v. Zabalza</u>, 346 F.3d 1255, 1258-59 (10th Cir. 2003); <u>United States v. Ozbirn</u>, 189 F.3d 1194, 1198 (10th Cir. 1999).  The particular facts and circumstances of each case determine the result.  <u>Cline</u>, 349 F.3d at 1287.

8.  The defendants do not dispute that Trooper Nicholas saw the truck move from its lane across the fog line two times.  In fact, Cruz-Chavez' initial comments to Trooper Nicholas virtually acknowledged that he had driven the truck over the fog line because he suggested that the faulty suspension of the truck had caused the movement.  Nevertheless, the defendants contend that Trooper Nicholas lacked reasonable suspicion to stop the vehicle in which they were riding for a violation of K.S.A. 8-1552(a).  First, they contend that a violation of the statute did not occur because the deviation from the lane of travel was "minor" or "minimal."  Next, they point to two factors that they apparently contend preclude a finding of reasonable suspicion:  (1) the intensity of the wind; and (2) the condition of truck, i.e., the faulty suspension.

9.     Having carefully reviewed the totality of the circumstances, the court finds that Trooper Nicholas had reasonable suspicion to stop the defendants' truck for a violation of K.S.A. 8-1522(a).  The evidence is undisputed that the truck crossed the fog line on two occasions by the length of a tire within a quarter mile.  The court does not find this deviation from the lane of travel to be as minor as suggested by the defendants.  The court also does not find that the wind intensity on that day precludes a finding of reasonable suspicion.  There was significant wind on that day.  However, the wind was blowing from the south and the movement of the truck was to the south.  Counsel for Cruz-Chavez tried to suggest at the hearing that the movement was due in part to over-steering by her client, but there was no evidence to support that theory.  Moreover, the faulty suspension of the truck, in combination with the wind, may have made it more difficult for Cruz-Chavez to keep the truck from drifting occasionally over the fog line.  Deputy Nicholas, however, had observed other traffic on that day and found the actions of this vehicle suspicious.  The court found his testimony credible.  As we noted in previous decisions on this statute, the court's role is not to decide whether the facts are sufficient to sustain a conviction under K.S.A. 8-1522(a), but to determine whether they are adequate to form an objectively reasonable suspicion that the truck was operated in violation of this statute.  The reasonable suspicion

analysis is not a license to conduct unrealistic second-guessing of police officers or to ignore the appropriate deference due trained officers. The court believes that, under the circumstances as indicated during the testimony provided at the hearing, Trooper Nicholas had objectively reasonable suspicion that K.S.A. 8-1522(a) had been violated. Given this finding, the court holds that the initial stop of the truck was justified and reasonable.

10. The court turns next to the subsequent detention of the defendants. The defendants contend that their continued detention after the initial stop was unreasonable. The defendants suggest that Trooper Nicholas had no reason to continue to detain them once he ascertained that the driver could safely drive and he had decided not to write them a ticket.

11. During a routine traffic stop, the detaining officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle. United States v. Miller, 84 F.3d 1244, 1250 (10ᵗʰ Cir.), cert. denied, 519 U.S. 985 (1996). The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning. United States v. Martinez, 983 F.2d 968, 974 (10ᵗʰ Cir. 1992), cert. denied, 508 U.S. 922 (1993). However, if the officer wants to detain the driver for further questioning, he may do so if "(1) 'during the

14

course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity;' or (2) 'the driver voluntarily consents to the officer's additional questioning.'" United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) (quoting United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994)).  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms." Id. (internal quotations and citation omitted).

12.  The court has examined the videotape of the stop.  The stop was brief.  Trooper Nicholas asked a few questions concerning the defendants' travel and travel plans.  He then sought a driver's license, registration and insurance information.  After he took the necessary steps to confirm the information provided by Cruz-Chavez, he returned to the truck and handed the documents to him.  He then told Cruz-Chavez that he may need to stop and have a cup of coffee. Trooper Nicholas then turned away before he reapproached the truck and asked Cruz-Chavez if he could ask a few a more questions. Cruz-Chavez readily agreed to answer some more questions.

13.  The court finds that the initial actions by Trooper Nicholas were proper and reasonable.  Even though he quickly told Cruz-Chavez that he was not going to give him a ticket, he still could properly converse with him about his travel plans and seek

his driving documents.  The court finds no Fourth Amendment violation in the actions of Trooper Nicholas immediately following the stop.

14.  The court next considers whether the encounter that led to the alleged consent to search was consensual.  A traffic stop may evolve into a consensual encounter, for "[o]nce the officer has returned the driver's documents, further questioning amounts to an unlawful detention only if the driver has objectively reasonable cause to believe that he is not free to leave."  United States v. Chavira, 467 F.3d 1286, 1290 (10th Cir. 2006).  "'Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'"  United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005) (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)).  Under this standard, "an officer is not required to inform a suspect that she does not have to respond to questioning or that she is free to leave."  Id.  A court looks at whether the officer made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled suggesting that the detention had not ended."  Id. at 1159 (internal quotation marks and citation omitted).

15.  Cruz-Chavez was confronted with one officer who did not physically touch him or his vehicle, and did not display his weapon or use a commanding voice.  Trooper Nicholas, in a conversational tone, inquired if he could ask some additional questions.  Cruz-Chavez offered no resistance and readily agreed to answer additional questions.  The court concludes that the totality of the circumstances indicates that the encounter after the return of the documents was consensual.  Given this finding, we need not consider whether Trooper Nicholas had acquired reasonable suspicion to believe that the defendants were involved in criminal activity other than simply failing to maintain a single lane of travel.

16.  The court next considers whether Cruz-Chavez consented to the search of the truck.  Cruz-Chavez has suggested that because he spoke Spanish he did not understand what Trooper Nicholas was asking when he asked to search the truck.  A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant.  See Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973); United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001).  The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue.  Zubia-Melendez, 263 F.3d at 1162 (10th Cir. 2001).  The government must show that there was no duress or coercion, express or implied, that the

consent was unequivocal and specific, and that it was freely and intelligently given.  _Id_.

17.  The court finds that the facts support the conclusion that consent to search was voluntarily given.  There is no evidence of coercion or duress.  There was no evidence that Trooper Nicholas threatened the occupants or used a hostile voice.  Finally, there is no evidence to support the contention that Cruz-Chavez failed to understand the request made by Trooper Nicholas.  Prior to that question, the two men had engaged in a conversation with very little difficulty.  An occasional problem occurred, but an understanding was always quickly found.  Cruz-Chavez promptly agreed to Trooper Nicholas' request for consent to search.  Cruz-Chavez made no effort after Trooper Nicholas began to search to object in any way to the search.  The totality of the circumstances indicates that Cruz-Chavez voluntarily consented to a search of the truck.

18.  Finally, the court must consider whether Trooper Nicholas had probable cause to arrest the defendants.  The defendants argue that the fact Trooper Nicholas found that an antenna could only be inserted a short distance into a vacuum hose was insufficient to demonstrate probable cause that the defendants had committed a crime.

19.  The Fourth Amendment does not prohibit warrantless arrests based on probable cause.  _Apodaca v. City of Albuquerque_, 443 F.3d

1286, 1289 (10th Cir. 2006). Probable cause to arrest exists when
the "facts and circumstances within the officers' knowledge, and of
which they have reasonably trustworthy information, are sufficient
in themselves to warrant a man of reasonable caution in the belief
that an offense has been or is being committed." United States v.
Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004) (quotation omitted).

20.   The apparent existence of a hidden compartment likely to
contain  contraband  is  sufficient  to  create  probable  cause  to
arrest.  United States v. Stephenson, 452 F.3d 1173, 1178 (10th Cir.
2006).   Trooper Nicholas believed there was a hidden compartment
based upon (1) the tooling on the screws on the manifold; (2) the
limited distance an antenna in a vacuum hose could be inserted; and
(3) the shiny metal plate seen in the manifold.   In addition, he
was familiar with hidden compartments in this area in Dodge trucks.
If  a  vehicle  has  a  hidden  compartment,  it  is  highly  likely  to
contain contraband.   United States v. Jurado-Vallejo, 380 F.3d
1235, 1238 (10th Cir. 2004).   Finally, the other suspicious matters
he noted suggested that the truck was probably carrying contraband.
In  sum,  Trooper  Nicholas  had  probable  cause  to  arrest  the
defendants  after  he  discovered  what  he  believed  was  a  hidden
compartment,  even  though  he  had  not  as  yet  discovered  the  illegal
drugs.  Stephenson, 452 F.3d at 1178.   Therefore, the court shall
deny defendants' motions to suppress.

21.   The  court  next  turns  to  the  issue  concerning  whether

Toscano-Burgueno waived his <u>Miranda</u> rights when he spoke with law enforcement officers after his arrest. He contends that he did not understand because they were not adequately explained to him in Spanish, the only language he spoke.

22. The government has the burden of proving by a preponderance of the evidence that a defendant was advised of his rights and voluntarily and knowingly waived them. <u>Lego v. Twomey</u>, 404 U.S. 477 (1972). The court's inquiry into the waiver's validity has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

<u>United States v. Smith</u>, --- F.3d ----, 2010 WL 2197524 at *3 (10th Cir. June 3, 2010) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

23. Viewing the totality of the circumstances, the court finds that Toscano-Burgueno validly waived his Fifth Amendment right to remain silent. Toscano-Burgueno was informed of his rights orally by Paul Tavares in Spanish and by reading a DEA form containing those rights in Spanish. At the hearing, Toscano-Burgueno sought to discredit Tavares' ability as an interpreter by pointing out that (1) he lacks experience in legal settings; (2) he

is not certified as a Spanish interpreter; and (3) he had some problems in interpreting certain words that were contained in a report written by the law enforcement officer who was with him during the interview of Toscano-Burgueno. The court was not persuaded by the matters noted by Toscano-Burgueno. Tavares is an experienced and knowledgeable interpreter. He has interpreted on numerous occasions and has done so in court settings. Tavares had no difficulties communicating with Toscano-Burgueno. Toscano-Burgueno never complained that he he did not understand. Based upon Tavares' testimony, the court finds that Toscano-Burgueno communicated sufficiently with Tavares so as to fully understand the nature of the right being abandoned and the consequences of that decision. Accordingly, the court finds defendant's waiver to be knowing and intelligent. The court further finds that the waiver was voluntary. Here, no coercion has been shown or alleged. Accordingly, the court shall deny Toscano-Burgueno's motion to suppress his statement.

**MOTIONS TO SEVER**

Both defendants have filed a motion to sever. Cruz-Chavez contends that he should be severed from his co-defendant because Toscano-Burgueno gave statements to law enforcement officers in which he implicated him. Based upon Bruton v. New York, 391 U.S. 123 (1968), the defendant contends that severance is necessary. Toscano-Burgueno contends that severance is appropriate because the

defendants will have mutually antagonistic defenses. The government does not object to severance. The government does request that Toscano-Burgueno be set for trial first.

Given the government's lack of an objection and the circumstances here, the court finds that severance of the defendants is appropriate. In accord with the request of the government, the court shall schedule the trial of Toscano-Burgueno first.

**MOTION TO DISMISS BASED ON RACIAL PROFILING/MOTION TO JOIN IN CO-DEFENDANT'S MOTION TO DISMISS BASED ON RACIAL PROFILING**

Cruz-Chavez seeks dismissal because he contends he is the victim of racial profiling. Toscano-Burgueno seeks to join in this motion, which the court shall allow. Cruz-Chavez notes that he is Hispanic. He suggests that Trooper Nicholas is known to stop people of color on a pretext. He contends that Trooper Nicholas stopped him, at least in part, based upon his race or ethnicity. He suggests, based upon the record provided in <u>United States v. Hernandez-Bustos</u>, No. 04-40159-01-RDR, 2005 WL 1631073 (D.Kan. 2005), that the court should order limited discovery and an opportunity to supplement the facts alleged in his motion.

The government contends that the defendants have made an insufficient showing to justify any further discovery or a more exhaustive hearing on the matter. The government asserts that the defendants have offered nothing to show Trooper Nicholas engaged in or has engaged in racial profiling.

At the hearing on the instant motion, the defendants offered the testimony of Zay Thompson, an investigator with the Kansas Federal Public Defender's Office since September 2009. He has previously worked as an investigator for the state public defender's office. He examined the records of the Wabaunsee County district court for the period from 2006 to 2010. He found that there were 31 criminal cases filed there during that period that involved Trooper Nicholas. He determined that 39% of them involved Hispanic defendants.

In considering the defendants' motion, the court must apply the following standards:

> A defendant claiming unequal enforcement of a facially neutral statute must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory intent. In order for a defendant to obtain discovery on these issues, the defendant need not establish a prima facie case of selective enforcement. Nevertheless, given the heavy burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution defense must "itself be a significant barrier to the litigation of insubstantial claims." A defendant who claims he was targeted for enforcement of traffic laws because of race or ethnicity is entitled to discovery on that claim only if he presents "some evidence tending to show the existence of the essential elements of the [selective enforcement] defense, discriminatory effect and discriminatory intent." A defendant cannot obtain discovery based on a bald, unsupported allegation of selective enforcement. Granting discovery subjects the governmental agency to considerable expense of time and money in gathering records, and obviously diverts its energy from its mission of law enforcement. Thus, the defendant must make some showing of discriminatory effect and discriminatory intent.

United States v. Duque-Nava, 315 F.Supp.2d 1144, 1152-53 (D.Kan. 2004) (footnotes omitted).

To establish discriminatory effect, a claimant must show that the law was enforced against him, but not similarly situated individuals of other races. United States v. Armstrong, 517 U.S. 456, 465 (1996); Duque-Nava, 315 F.Supp.2d at 1153. Discriminatory effect can be shown by either showing a similarly situated individual or through the use of statistical evidence. Marshall v. Columbia Lea Regional Hospital, 345 F.3d 1157, 1168-69 (10th Cir. 2003). Statistics and circumstantial evidence also may be utilized to create an inference of discriminatory purpose, but rarely will statistics alone be sufficient to establish discriminatory intent. Duque-Nava, 315 F.Supp.2d at 1161-62. Discriminatory purpose implies more than intent as awareness of consequences, and implies that the decision maker selected or reaffirmed a particular course of action at least in part "because of" rather than "in spite of" its adverse effects on an identifiable group. Id. at 1160-61 (citations omitted).

In Hernandez-Bustos, we reached the following conclusions:

> The court is not persuaded that the defendant has made a sufficient showing of discriminatory effect. The court is convinced that the evidence offered by the defendant has so many problems that it cannot be relied upon to establish discriminatory impact. Judge Crow determined that the Lamberth study was so flawed that it could not be relied upon to establish discriminatory effect in a case involving a stop by Deputy Schneider. [United States v.] Alcaraz-Arrellano, 302 F.Supp.2d [1217] at 1228-1232 [(D.Kan. 2004)]. He determined that

24

the study was irrelevant and unreliable because (1) it states nothing about Russell County or Deputy Schneider; (2) the benchmark data is not sufficiently reliable; (3) the stop data lacks trustworthiness; (4) it fails to rule out alternate explanations; and (5) it does not identify similarly situated individuals. <u>Id</u>. He also found that the other statistical evidence, including the reports showing stops by Russell County deputies, including Deputy Schneider, and the report of the Federal Public Defender's officer were also faulty for several reasons. <u>Id</u>. at 1232-33. Judge Robinson examined much of the same evidence. It appears that she examined virtually the identical evidence that is presently before this court and determined that, although the evidence had flaws, it did sufficiently demonstrate discriminatory effect. [<u>United States v.</u>] <u>Mesa-Roche</u>, 288 F.Supp.2d [1172] at 1189-90 [D.Kan. 2003)]; <u>Duque-Nava</u>, 315 F.Supp.2d at 1159. This court is inclined to follow the analysis of the evidence by Judge Crow. As pointed out by the government, this evidence suffers from a variety of problems. At first glance, it appears to show discriminatory effect or disparate treatment. However, upon closer inspection, the various defects in this evidence overcome its use as reliable evidence in support of a finding of discriminatory effect.

Even if the court were persuaded that the evidence showed discriminatory effect, we cannot find that the defendant has made an adequate showing of discriminatory intent. The court has found that Deputy Schneider did not know the race or ethnicity of the occupants of the van prior to the stop. The significance of this finding is noted by Judge Crow in <u>Alcaraz-Arrellano</u>: "Without proof of the officer's knowledge of a driver's race, an intent to discriminate against a driver because of his race can rarely, if ever, be shown." 302 F.Supp.2d at 1234. Moreover, there is no evidence that Deputy Schneider exhibited any discriminatory behavior towards the occupants of the van on this occasion or towards any other persons he has previously stopped. Under these circumstances, the court fails to find sufficient non-statistical evidence to demonstrate discriminatory intent. Accordingly, the court finds that the defendant has not demonstrated a prima facie showing of selective enforcement and is not entitled to any additional discovery. The defendant's motion to dismiss based upon racial profiling must be denied.

<u>Hernandez-Bustos</u>, 2005 WL 1631073 at *7.

The court has carefully considered the evidence presented here and we fail to find sufficient evidence to demonstrate the need for additional discovery on this issue. Counsel for the government and Cruz-Chavez engaged in hyperbole in arguing their positions concerning this motion. The bottom line is the court found no evidence that Trooper Nicholas stopped the vehicle in which the defendants were riding due to their race or ethnicity. Without any proof that Trooper Nicholas had knowledge of the defendants' ethnicity or race prior to the stop, the court is at a loss how an intent to discriminate can be found. The very minimal evidence that the defendants offered to support their contention that additional discovery is necessary was clearly insufficient. The suggestion that the cases from Wabaunsee County state court show sufficient evidence of discriminatory intent by Trooper Nicholas borders on frivolous. In sum, the court finds nothing here that would cause us to arrive at a different conclusion than the one we reached in <u>Hernandez-Bustos</u>. Accordingly, defendants' motion to dismiss based upon racial profiling is hereby denied.

**MOTION FOR DISCOVERY**

Toscano-Burgueno has filed a motion for discovery in which he seeks (1) the rough notes of the law enforcement agents interviewing him on April 6, 2010; (2) any documents reflecting the Spanish speaking proficiency of Deputy Tavares; and (3) any complaints of racial profiling against Trooper Nicholas.

The government agreed to provide all of the requested materials to the extent they exist and apparently did so prior to the court's hearing on these motions. With the government's response, the court shall deny this motion as moot.

**IT IS THEREFORE ORDERED** that defendant Cruz-Chavez' motion to sever (Doc. # 13) be hereby granted. These cases shall be severed for the purposes of trial. The court shall conduct the trial of defendant Toscano-Burgueno first.

**IT IS FURTHER ORDERED** that defendant Cruz-Chavez' motion to dismiss indictment based on racial profiling (Doc. # 14) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Cruz-Chavez' motion to suppress (Doc. # 15) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Toscano-Burgueno's motion to join co-defendant's motion to dismiss based on racial profiling (Doc. # 21) be hereby granted.

**IT IS FURTHER ORDERED** that defendant Toscano-Burgueno's motion to sever (Doc. # 22) be hereby granted.

**IT IS FURTHER ORDERED** that defendant Toscano-Burgueno's motion for discovery (Doc. # 23) be hereby denied as moot.

**IT IS FURTHER ORDERED** that defendant Toscano-Burgueno's motion to suppress statement (Doc. # 24) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Toscano-Burgueno's motion to suppress (Doc. # 25) be hereby denied.

27

**IT IS SO ORDERED.**

Dated this 17th day of August, 2010 at Topeka, Kansas.

                              s/Richard D. Rogers
                              United States District Judge